# EXHIBIT 6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

---

THE HONORABLE MARIANA R. PFAELZER, U.S. DISTRICT JUDGE

PRESIDING

**CERTIFIED COPY**

|  |  |  |
|---|---|---|
| NEUROGRAFIX, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. CV 10-1990-MRP |
| | ) | |
| | ) | |
| SIEMENS MEDICAL SOLUTIONS USA, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

LOS ANGELES, CALIFORNIA

WEDNESDAY, OCTOBER 5, 2011

**MOTIONS**

DEBORAH K. GACKLE, CSR, RPR
United States Courthouse
312 North Spring Street, Room 402A
Los Angeles, California 90012
(213) 620-1149

1   APPEARANCES OF COUNSEL:

2

3

4        For the Plaintiff:

5

6            Russ, August & Kabat
             By:  MARC A. FENSTER
7            By:  ANDREW A. WEISS
             By:  FREDRICK UNG
8            12424 Wilshire Blvd 12th Fl
             Los Angeles, CA 90025
9            Phone: (310) 826-7474
             Fax:   (310) 826-6991
10           E-mail: mfenster@raklaw.com
             E-mail: aweiss@raklaw.com
11           E-mail: fung@raklaw.com

12

13

14

15

16       For the Defendant:

17

18           Kirkland & Ellis LLP
19           By:  GREGG LOCASCIO
             By:   SEAN M. McEldowney
20           655 Fifteenth Street NW Suite 1200
             Washington, DC 20005
21           Phone:  (202) 879-5290
             Fax:    (202) 879-5200
22           Email: gregg.locascio@kirkland.com
             Email: sean.mceldowney@kirkland.com

23

24

25

1    LOS ANGELES, CALIFORNIA; WEDNESDAY, OCTOBER 5, 2011; 11:10 A.M.

2                            - - - - -

3

4              THE CLERK:  In the matter of calendar item 1, case

5    No. CV 10-1990, NeuroGrafix versus Siemens Medical Solutions

6    USA, Inc.

7              Counsel, please state your appearances for the

8    record.

9              MR. FENSTER:  Good morning, Your Honor.  Marc Fenster

10   with Russ, August and Kabat.  With me today is Andrew Weiss and

11   Fredricka Ung -- U-n-g -- and we're here on behalf of the

12   plaintiffs.

13             MR. LoCASCIO:  Good morning, Your Honor.  On behalf

14   of the defendants, Siemens Medical Solutions and Siemans A.G.,

15   Gregg LoCascio from Kirkland and Ellis, LLP, along with my

16   partner, Sean McEldowney.

17             THE COURT:  Now, let's do it in the order it's here.

18   Let's start with this motion for -- let's not do it that way.

19   Just a minute.

20             Let's start with the reconsideration motion, which is

21   No. 3 on the calendar.

22             MR. FENSTER:  Your Honor, may I approach?  I have

23   binders with slides we'll be using today for the court and for

24   the clerks.

25             THE COURT:  Thank you.

1          THE CLERK:  Thank you.

2          THE COURT:  Have you seen these?

3          MR. LoCASCIO:  Yes, Your Honor.  We exchanged them

4     when we got in this morning.

5          THE COURT:  All right.  That's fine.

6          MR. FENSTER:  Your Honor, we respectfully ask the

7     court to reconsider its ruling that claims 36, 39, 46 and 49

8     are step-plus-function claims.  The Federal Circuit has never

9     applied step-plus-function claims to a method or process

10    claims, ever.  Every time that it has come up before the court,

11    where the lower court applied step-plus-function claims, the

12    Federal Circuit reversed.  The only situation in which the

13    Federal Circuit even allowed a step-plus-function construction

14    to be applied was in the majority opinion in *Seal-Flex*, and

15    that is the opinion in which Judge Rader penned his concurring

16    opinion explaining why the court should have reversed the

17    court's claim construction and held that it was not

18    step-plus-function; and that is the *Seal-Flex* concurring

19    opinion that this court cited in its claim construction order.

20          Slide three, please.

21          The application of a step-plus-function doctrine in

22    this case is just contrary to Federal Circuit law.  What *Masco*

23    says is that, "... we are unwilling to resort to that

24    provision" -- meaning Section 112, paragraph six -- "to

25    constrain the scope of a claim limitation without a showing

1   that the limitation contains nothing that can be construed as

2   an act."

3         Each of these claims are not written in

4   means-plus-function form.

5         Next slide.

6         First, they're not written in means-plus-function

7   format, so they are presumptively not means-plus-function.

8   Moreover, it can't be construed unless there is a showing that

9   the limitation contains nothing that can be construed as an

10   act.

11         Now, the court goes further -- the Federal Circuit

12   says that "Where a preamble" -- this is next slide, please --

13   "Where a preamble sets off the steps of a claimed method with

14   the phrase, 'comprising the steps of,' as opposed to 'the steps

15   for,' that is further indication that the patentee did not

16   intend to invoke Section 112, paragraph six."  And that is how

17   paragraph 36 is set out.  It is a method including the "steps

18   of," and then it goes through and lists the steps, the acts,

19   which are exposing, exposing, sensing, vector processing and

20   processing.  Each of the claims that this court held were

21   step-plus-function contain acts.

22         Next slide.

23         THE COURT:  Because they have an "i-n-g" on the end

24   of the verb?

25         MR. FENSTER:  No, Your Honor, not only that.  Each of

6

1    the acts -- a-c-t-s, acts -- that are recited in claims 36, 39,

2    46, and 49 are transitive verbs.  "Processing" is "to operate

3    on."  It is a verb with an object.  It's a transitive active

4    verb.  That is true with "analyzing" and "combining."  These

5    are active verbs with objects.  They are acts acting upon an

6    object.

7             The Federal Circuit in -- Judge Rader, in his

8    concurring opinion in *Seal-Flex*, cited by this court, explained

9    the difference and explained when an "i-n-g" verb -- or an

10   "i-n-g" word should be an act and not a function.

11            THE COURT:  Yes, I know that.

12            MR. FENSTER:  And what the court said is that a

13   function corresponds to what the element accomplishes, whereas

14   "acts" correspond to how the function is accomplished.

15            THE COURT:  Let me shortcut this a little bit.  I

16   realize that whoever drafted the claim was perhaps not

17   intending this to be step-plus-function, and you're asking the

18   court to look at what the person intended who drafted the

19   claim.

20            MR. FENSTER:  In part, but I'm asking the court to

21   apply the Federal Circuit law.  The Federal Ciruit law says

22   this claim is presumed not to be step-plus-function --

23            THE COURT:  I understand about the presumption; I'm

24   not quarreling with that.

25            MR. FENSTER:  Yes.  I think that the courts do look

1    to whether the patentee intended to invoke Section 112,

2    paragraph six, they do look to the language to see whether that

3    intent was evoked, they look to the file history to see whether

4    or not the patentee intended to invoke 112, six.  All evidence

5    in this case undisputably indicates that the patentee did not

6    intend to invoke 112, paragraph six.  I agree with Your Honor

7    that's not the end of the inquiry.

8              THE COURT:  No, it isn't.

9              MR. FENSTER:  So what we have to do is follow the

10   analysis set forth by Judge Rader in *Seal-Flex*, and in

11   *Seal-Flex*, that patent dealt with -- go back to seven -- you're

12   on seven -- so that patent claimed "Spreading an adhesive tack

13   coating for adhering the mat..."

14             THE COURT:  Let me cut through this point, too.

15             MR. FENSTER:  Okay.

16             THE COURT:  Is this claim that we're looking at a

17   claim for software?

18             MR. FENSTER:  No.

19             THE COURT:  What is it?

20             MR. FENSTER:  It's a process claim.  It's a method

21   claim.  This is claim 36, Your Honor.  It's a method for

22   utilizing an MRI machine.

23             THE COURT:  And a computer.

24             MR. FENSTER:  And a computer to determine the shape

25   and position of a structure.

1          THE COURT:  Moreover, it's a standard computer, isn't
2    it?
3          MR. FENSTER:  No, I don't believe it is, Your Honor.
4          THE COURT:  Well, now, who programmed the computer to
5    do what you want it to do?
6          MR. FENSTER:  A computer is not claimed in this
7    method claim.  I think that there are process -- there are
8    apparatus claims in claims 54 and 55, in those claims, which do
9    claim the apparatus.
10         THE COURT:  Wait.  How do you process the
11   information, the data set at this -- on this limitation?  How
12   do you process it?  With a computer, don't you?
13         MR. FENSTER:  Yes --
14         THE COURT:  Wait.  It's not just any computer, is it?
15   It's one that is programmed.
16         MR. FENSTER:  The method claim does not specify, nor
17   require, nor could it, the apparatus used to perform the steps.
18         THE COURT:  So you use whatever is at hand, do you
19   not?
20         MR. FENSTER:  This claim would be met if that
21   processing step is done with anything.
22         THE COURT:  That's right, with anything.  But it has
23   to be a programmed computer.  It's a software step.
24         MR. FENSTER:  I disagree with the court's
25   characterization, Your Honor.  This is not -- this is -- it is

1    a process claim, it is a method claim.  It is not limited to

2    any particular apparatus.  It is improper and, in fact, would

3    render the claims indefinite under IPXL if we had mixed

4    apparatus and method claims.  This is not an apparatus claim,

5    and I think that it is improper for the court to be looking --

6    to be thinking about this as an apparatus claim and what's --

7              THE COURT:  All right, then.  This is your broadest

8    set of claims.  You just process however you process on

9    whatever is at hand.

10             MR. FENSTER:  I disagree with that characterization

11   as well, Your Honor.

12             THE COURT:  You tell me how to read it.  You tell

13   me -- all right.  Let's get right to it.  You tell me,

14   Mr. Fenster, that this step, this limitation, do you see it,

15   (e), is it?

16             MR. FENSTER:  Yes.

17             THE COURT:  You process the data representative of

18   what you want to generate a data set describing the shape and

19   position.  Now -- et cetera.

20             You do that on a computer which has been programmed

21   to permit one skilled in the art to do it, right?

22             MR. FENSTER:  I think that the answer is right, but

23   the question is irrelevant to the analysis of

24   step-plus-function.

25             THE COURT:  Go ahead.

1          MR. FENSTER:  For step-plus-function, you only look

2     to see whether an act is recited, and Judge Rader counseled

3     us --

4          THE COURT:  All right.  Let me just grant you this.

5     I'm not purporting to have a real dispute with you, I'm trying

6     to get out what you're saying.  Let's assume it's not a

7     step-plus-function claim, just as you say.  Now you tell me the

8     processing is done some way by somebody, and but they have to

9     begin with a computer, don't they?

10          MR. FENSTER:  I don't believe so.  So that is a fair

11     question, Your Honor.

12          THE COURT:  You wouldn't have to begin with a

13     computer?  You said that in the patent.

14          MR. FENSTER:  I think as a practical matter that is

15     how it's done, but as a matter of claim construction, no.

16          THE COURT:  Oh, well, but the processor is a computer

17     under the patent.

18          MR. FENSTER:  But the claim -- this claim, claim 36,

19     does not claim a processor, it claims a method, and I believe

20     that it is -- that the court is confusing the analysis of the

21     means-plus-function apparatus claims with this method claim in

22     claim 36; and claim 36 requires the step of processing the data

23     to perform a function, which is to generate a data set, and the

24     act is processing.

25          Now, it is a fair question to say, Well, what does

1   processing mean?

2          THE COURT:  That's right.

3          MR. FENSTER:  Okay.  So that is a fair question, and,

4   in fact, that's what the Federal Circuit did in -- I'll find

5   the case in just a second.  But when they found that it's not

6   step-plus-function, they remanded to the court to say, Okay,

7   determine what "processing" means or "determining" means.

8          THE COURT:  That's precisely what I'm asking you.

9          MR. FENSTER:  That is an absolutely fair question,

10  and it's one that has not been presented to the court.  And

11  honestly --

12         THE COURT:  Oh, yes it has.  Whether you have

13  presented it or the court's presented it to itself, it has been

14  presented.

15         MR. FENSTER:  Okay.  Well, my apologies to the court.

16  I don't believe that we have briefed the meaning of

17  "processing" on its own.

18         THE COURT:  Okay.  Then I will present it to you.

19         MR. FENSTER:  I'm not prepared to answer what

20  "processing" means.  "Processing" means to operate on the data

21  in order to generate a data set.  I am not prepared to offer a

22  claim construction of processing right now because that's not

23  where -- I apologize that I'm not.

24         THE COURT:  Well, wait.  Let's just look at the --

25  we're now on a controversy that I cannot resolve with you this

1    way.  I'm saying to you, first of all, assume for a minute that

2    it's not step-plus-function.  I understand what your objection

3    to that is.  You'd be limited to whatever is in the spec, and

4    you'd have to have a link with that, and there isn't anything

5    in the spec except references.  Wait.  Let me -- I can clear up

6    what is wrong with my thinking if I just point out to you that

7    on column 11 -- we have to have this out now because if we

8    don't, we're going to -- column 11 says, A computer, 72, and

9    the front-end circuit, 74, form the processing system, 16, the

10   input and the -- and so on and so on -- as shown in six.

11   Computer, 72, and circuit, 74, cooperatively control and

12   synchronize the operation of the MRI system, 14, as well as

13   processing a display.  The acquired data, the computer, 72, is

14   an IBM-compatible personal computer.  Then it tells you about

15   it.

16              Somebody's got to program the computer.

17              MR. FENSTER:  I agree with you that for the

18   means-plus-function apparatus claims, we do have to analyze

19   what is doing the processing because those were

20   means-plus-function claims.

21              THE COURT:  Don't you have to do it now?  If it's a

22   software patent, irrespective of whether it's

23   step-plus-function, wouldn't you have to have -- point out some

24   way of programming or --

25              MR. FENSTER:  No.

1          THE COURT:  No?

2          MR. FENSTER:  Absolutely not.  Your Honor --

3          THE COURT:  So your skilled -- your person skilled in

4    the art uses whatever is there.

5          MR. FENSTER:  If they process in order to generate a

6    data set to determine the shape and position, which is the

7    function recited, then they perform the steps set forth in the

8    method.  Now, it is a fair question to say, Do we need any

9    further construction of processing the data or not?

10         THE COURT:  That's right.

11         MR. FENSTER:  We submit that it has a common,

12   ordinary meaning, and the only challenge -- the only question

13   raised before the court --

14         THE COURT:  What is its common, ordinary meaning?

15   It's in here.

16         MR. FENSTER:  I think the common, ordinary meaning of

17   processing the data is operating on the data in a way to

18   generate the data set, but it's not -- the common, ordinary

19   meaning is not the apparatus used or the software or the

20   algorithm or the computer used to do it.

21         THE COURT:  Could you do it without a computer?

22         MR. FENSTER:  No.  But, again, Your Honor, that is

23   irrelevant to the question of whether this is

24   step-plus-function, and if it's not step-plus-function, then

25   we're in normal claim construction --

14

1          THE COURT:  I am abandoning step-plus-function.  I'm

2     now saying to you let's assume for a minute that it's not.

3          What flows from that conclusion?

4          MR. FENSTER:  Okay.  What flows from that conclusion

5     is the court needs to determine if any claim construction is

6     necessary as a normal act, as a normal word, "processing,"

7     whether that word is so unclear that the court needs to give

8     guidance to the jury to tell them what "processing" means.

9     This is not a question that was raised before the court.  The

10    only issue raised before the court on -- at the claim

11    construction phase initially was what was Siemens' position

12    that this is step-plus-function.  That's it.  We disagreed, but

13    there was no alternative if it's not step-plus-function, what

14    is the proper claim construction.

15         THE COURT:  You're asking the alternative now.  I'm

16    asking.

17         MR. FENSTER:  And our position is it doesn't need

18    claim construction, that it is just to operate on the data

19    that -- processing the data is something that the jury will

20    understand.

21         THE COURT:  How would they understand it?

22         MR. FENSTER:  It's not --

23         THE COURT:  Can't do it by hand.

24         MR. FENSTER:  I think -- I think it would be improper

25    for the court -- if we go through a claim construction process

1   where we say, Okay, what is proper claim construction, and

2   defendant and plaintiff exchange proposed claim constructions

3   and brief it to court, we'll come up with a proper claim

4   construction.  That claim construction would not be limited to

5   a particular algorithm or a particular apparatus for doing it.

6           THE COURT:  No?  Why?

7           MR. FENSTER:  Because it would be improper to import

8   an apparatus limitation into a method claim.  Method steps are

9   generally --

10          THE COURT:  So how does your expert explain to them

11  what's to be done here?  Your expert says you process on this

12  computer that we have attached to the MRI machine.

13          MR. FENSTER:  Yes, but that doesn't mean -- just

14  because the infringement analysis shows that a computer is used

15  to perform that step does not mean that the proper claim

16  construction would limit it to a particular apparatus or not.

17          THE COURT:  I want to put it very directly to you:

18  Just any way you process would be infringing.  I mean, you'd

19  meet the infringement requirement for this limitation.

20          Isn't that true?

21          MR. FENSTER:  Your Honor, claim 36 is a very specific

22  claim.  What it requires is that you use, in step (a) --

23          THE COURT:  Oh, I know what you do in step (a).

24          MR. FENSTER:  Well, Your Honor, this is important

25  because this is -- you're asking me an open-ended question to

1    suggest that this is a very broad claim, and it is not.

2            THE COURT:  Any way you process under your theory,

3    any way an expert will get on the stand and say, Well, there's

4    always a computer attached to the MRI machine, and any way you

5    process using that computer you're infringing.

6            MR. FENSTER:  If you perform the step of processing

7    data representative of anisotropic diffusion to generate a data

8    set that describes the shape and position, then, yes, I believe

9    that that act --

10           THE COURT:  Any way you do it.

11           Now, let's assume for a minute that the years go by

12   and various companies come up with better ways to do that.  It

13   doesn't matter whether they have a better way or not, any way

14   you do it will infringe.

15           MR. FENSTER:  Your Honor, I'm troubled by the

16   court -- by what I perceive as the court's disposition to

17   invalidate the patent.

18           THE COURT:  You are totally wrong.  You are

19   completely wrong, Mr. Fenster.

20           MR. FENSTER:  I hope so.

21           THE COURT:  I do really have to stop you right there.

22           MR. FENSTER:  Okay.

23           THE COURT:  You don't need to think that I have spent

24   all these hours on this patent with the idea of invalidating

25   it.  I would not venture that if I were you.

```
 1              MR. FENSTER:  Okay.  I apologize to the court.

 2              THE COURT:  You have absolutely no idea of the amount

 3   of time that's been spent on this, none.  You have no idea.

 4   And, consequently, you must not jump to the conclusion that you

 5   jumped to.  I don't want to do you a disservice; I do want to

 6   understand what you're talking about.

 7              MR. FENSTER:  Okay.  So, Your Honor, the --

 8              THE COURT:  That's my job.

 9              MR. FENSTER:  I appreciate that, Your Honor.

10              The processing step -- so in a claim -- in a claimed

11   method, you look to determine whether a method is comprised of

12   certain steps that accomplish certain functions that are

13   recited.  If those acts are performed, then the claim is met --

14   and, yes, it may be that after-developed technology further

15   improves the processing, that's not -- if anything, that's an

16   enablement question, it's not a claim construction and it's not

17   an infringement question.  But the case law, as I understand

18   it, has developed such that when a claim specifies the acts in

19   a method claim or the elements of an apparatus claim, it is

20   broad enough to encompass certain after-developed technology.

21              And so, yes, I do agree that if someone performs the

22   steps as recited in claim 36, however they do it, with whatever

23   apparatus they do it, claim 36 will be infringed.  That is my

24   understanding of claim 36, and I believe that it's fully

25   supported from a 112 perspective in terms of enablement by the
```

1   specification.  The specification fully enables how to perform

2   each of the steps of claim 36 and that's what the law requires.

3   And then if -- see what comes up with a new and better MRI

4   machine or a new and better algorithm for processing but still

5   performs the steps of these methods, it's covered.

6            THE COURT:  You and I perfectly agree on your

7   position, perfectly.

8            MR. FENSTER:  Okay.

9            THE COURT:  But there's no reason why we can't

10  discuss it, is there?

11           MR. FENSTER:  Not at all, and I love the discussion,

12  I really do.

13           THE COURT:  Well, let me tell you:  It was hard to

14  get to this point.  That's what you're saying, isn't it?

15           MR. FENSTER:  Yes, Your Honor.

16           THE COURT:  Let me hear from the other side.

17           MR. FENSTER:  Sure.

18           MR. LoCASCIO:  Good morning, Your Honor.

19           THE COURT:  I'm not on your side.

20           MR. LoCASCIO:  I don't come in anticipating that the

21  court, in any court, much less this one, leans one way or the

22  other.  My view is Your Honor's job, and you've done to date,

23  call them balls and strikes, to interpret the law.  That is

24  what the court, as I understand it, is here to do.  That's

25  claim construction in a nutshell, and I don't think either

```
1    side, frankly, disagrees with that, Your Honor.

2              THE COURT:  All right.

3              MR. LoCASCIO:  Let me start off with -- two questions

4    Your Honor asked.  I just want to give an answer to those as

5    you asked them.  I was looking through the patent and thinking

6    about some of those issues, and now I want to walk through some

7    points we prepared on this, Your Honor.

8              First off, I think Your Honor identified exactly

9    where in the patent the processing is described, and that was

10   column 11.  I believe Your Honor was reading from line nine

11   through about 16 or 17.

12             THE COURT:  Right.

13             MR. LoCASCIO:  The distinction between the apparatus

14   and the method claims are the apparatus, as Your Honor

15   determined, covers this black box to process.  It's

16   means-plus-function --

17             THE COURT:  Right.

18             MR. LoCASCIO:  The method claims cover using that

19   black box to process.  That's the difference between those

20   claims.  And either the step-plus-function claims are

21   step-plus-function without any identified structure, which is

22   what Your Honor found, i.e., indefinite; they are

23   step-plus-function with structure, which you'd have to go back

24   to the specification to find it.  There is none.  Or, on

25   Mr. Fenster's analysis, that we just go ordinary meaning and
```

1   ignore 112, paragraph six.  At that point, what would happen to
2   this claim is it would be not enabled.
3         There's no route through this.  Mr. Fenster would
4   like to have it not be a claim construction issue, but nowhere
5   in this patent does it tell you how you would do that
6   processing.  I want to talk about how it is step-plus-function
7   under 112, six, and Your Honor's construction of that is
8   correct and consistent with Federal Circuit law.
9         But even if the hypothetical Your Honor played out
10  with Mr. Fenster of it's not step-plus-function, Well, where do
11  we go from there from a claim construction standpoint?
12  NeuroGrafix' view would be you need do nothing.  I disagree.
13  But the ultimate outcome of doing nothing would then create the
14  very same problem that's recognized when you actually look at
15  what does it describe to perform this.  There's no enablement
16  at all of this, and, indeed, it's not an issue for today,
17  although it's now, sort of, become one a little bit.
18        The inventor -- one of the inventors, Dr. Tsuruda,
19  testified that at the time they filed this, they had no
20  software algorithm to do it, they'd never done it.  It was a,
21  Hey, wouldn't it be great if we could do this?
22        And the way they've claimed it, it's
23  step-plus-function.  At the end of the day, if it wasn't, it
24  wouldn't be enabled.  But let me, sort of, back up now to the
25  step-plus-function analysis and start off where Mr. Fenster

1    did.

2            What's the state of the law?  Well, the Federal

3    Circuit law we can look at, we can talk about.  I want to talk

4    about the four primary cases at issue --

5            THE REPORTER:  Excuse me.  Counsel, please slow down.

6            MR. LoCASCIO:  Sure.  Pardon me.  Thank you for

7    letting me know.

8            Thirty-five U.S.C. 112 is the law, and it says you

9    can have means-plus-function and step-plus-function.  And

10   NeuroGrafix' position seems to be there's no such thing as

11   step-plus-function.  There are points in the reply brief where

12   they say if it could even be found -- if claims could ever be

13   found to be step-plus-function, well, that's certainly not the

14   law.  Paragraph six of Section 112 of 35 U.S.C. makes clear

15   they exist.  And let's look at what the Federal Circuit has

16   actually said.

17           The key is what does the claim say?  It all comes

18   back to not what the inventors intend, absent disclosure of

19   that --

20           THE COURT:  Well, it is a, kind of, general rule

21   about how to write it.  There are some general rules about how

22   to write these things.

23           MR. LoCASCIO:  If we look at the section we're

24   talking about --

25           THE COURT:  (E).

22

1          MR. LoCASCIO:  (E), exactly.  Claim 36(e), processing

2     the data to generate.  And the difference between this and the

3     claim language in the earlier Federal Circuit cases is -- let's

4     talk about *Seal-Flex* last -- okay -- the other three, *Cardiac*

5     *Pacemakers*, *Masco* and *O.I. Corp*.  The claim language in those

6     is not a "step for" or a "step to" or something akin to a verb

7     "processing to" or "processing for."

8          The language -- I have just my notes on these.  We

9     can pull the actual case up.  But *Cardiac Pacemakers*, for

10    instance, is determining a condition -- zoom out here --

11    determining a condition of the heart from among.  That is a

12    traditional piece in a method claim, it's a step, but it

13    doesn't have function.  It's not a "step for" doing anything.

14    It's just determining a condition.  It's not surprising that

15    the Federal Circuit said that's not 112, six.

16          *Masco* is transmitting a force applied to a dial or

17    applied to a knob.  Again, it's not a "step for" or "step to"

18    do anything.  *O.I. Corp.*, passing the analyte slug through a

19    passage, et cetera.  Again, there's not a verb "to do"

20    something in any of those.  So the fact that the Federal

21    Circuit in each of those cases said it's not 112, six shouldn't

22    surprise anyone?

23          In *Seal-Flex*, by contrast, it is spreading adhesive

24    tack for adhering.  So what you have is a verb, "spreading," to

25    accomplish something:  Spreading for adhering.  And that is

1    akin to the situation we have here because the language here is

2    "processing the data set to generate."  And in *Seal-Flex*, the

3    court said the parties agreed it was 112, six, even though it

4    wasn't presumptively so, and that was left standing on appeal.

5           In this case, we have similar language.  We have

6    "processing the data to generate a data set."  So it comes down

7    to is it presumptively means-plus-function?  They don't use the

8    magic words "step for," although I want to -- actually, I left

9    the clicker over there.

10          Sean, can you just type slide seven?

11          Your Honor, may I approach with some slides?

12          THE COURT:  Do.

13          MR. LoCASCIO:  Thank you.

14          And what we see here in slide seven, Your Honor --

15   I've got it on the screen, as well, is -- pardon me.  What we

16   handed Your Honor has several sections.  We put them in the

17   order we had wrongly anticipated we might proceed through here.

18   So there is a tab called "Step-plus-function," which is the

19   last tab, and slide seven in that deck is what I've got on the

20   screen right now, which talks about how processing doesn't

21   describe or cite an act.  And Mr. Fenster put up some

22   definitions of processing and analyzing.  Those were not in the

23   briefing on Markman; what I've got on the screen was.

24          On the right side in slide seven is a dictionary

25   definition of "processing," and it's previously before Your

1    Honor.  "Processing" means put through the steps of a

2    prescribed procedure.  And if you look then below, the *O.I.*

3    *Corp.* quote on page seven, steps -- "We interpret the steps to

4    refer to the generic descriptions of elements of a process."

5         So by using "processing," Your Honor, in some ways

6    we've just synonymized "steps" and "processing."  The

7    definition of "process" is to put something through certain

8    steps.  The court -- the Federal Circuit has determined "steps"

9    to be a generic description of the elements of a process,

10   whereas "acts" refers to how to actually do it.

11        So the idea that "processing" tells one how to do it

12   is inconsistent with the ordinary meaning and definition of

13   "processing," which means put it through steps.

14        At the end of the day, this claim, Your Honor, is

15   not -- I'm not arguing it's presumptively step-plus-function --

16        THE COURT:  You can't.

17        MR. LoCASCIO:  I'm not.  We agree that I can't

18   because -- and I'm not.

19        But the language that they actually used here is

20   virtually synonymous with saying "steps to generate" because

21   given they've said "processing to generate."  And whether that

22   was artful to try to avoid the presumption or not, doesn't

23   matter.  The specification in the file history here never

24   describe -- never give any indication that we should deviate

25   from how this claim is written.  And how the claim is written,

25

1    you have to come back to, Your Honor, how the function is

2    accomplished.  If I back up a slide, to slide five, the act

3    here --

4           THE COURT:  Well, Mr. Fenster says that it doesn't

5    matter how you do it.

6           MR. LoCASCIO:  The Federal Circuit in *Seal-Flex* and

7    *O.I. Corp.* say you have to describe in your claim how to do it,

8    and if you do not, while the presumption may exist in one

9    direction, it would be overcome and rebutted, as Your Honor

10   found, in the *Markman* decision if they don't describe it.

11          THE COURT:  Well, let's just assume, because

12   Mr. Fenster does not want a step-plus-function analysis of this

13   claim because it would limit him to what is in the spec, and

14   there isn't anything in the spec.  And, consequently, we have

15   to take another tack here for the purpose of discussion.

16          Let's assume for a minute that the motion to

17   reconsider is granted and it's not construed as a

18   step-plus-function claim.  What then?

19          MR. LoCASCIO:  If it's not construed as a

20   step-plus-function at all, and, obviously, I expect Your Honor

21   already recognizes that we disagree with that presumption.

22          THE COURT:  Of course.

23          MR. LoCASCIO:  I know.  Just wanted to make clear

24   that any reader of this later in life says, Okay, Mr. LoCascio

25   didn't say we were onboard with this.

26

```
 1              If that was the case, I think you'd have an issue
 2    where, if it was ordinary meaning -- which is Mr. Fenster's
 3    only proposed construction for this -- then you'd have a
 4    situation where the claim is not enabled.
 5              THE COURT:  Is what?
 6              MR. LoCASCIO:  Not enabled.  That's where I think
 7    that would go.
 8              THE COURT:  Is it described?
 9              MR. LoCASCIO:  I don't believe how to accomplish
10    it -- which would be what you would need to describe here -- is
11    anywhere in this specification, Your Honor.  All it says is you
12    could use a computer to process, but it doesn't tell you what
13    that computer would have or frankly how you would do this.
14              THE COURT:  Let's go to the next step.
15              MR. LoCASCIO:  Okay.
16              THE COURT:  Let's assume that, whatever meaning you
17    give it and that an expert gets to testify about how this would
18    be done, there is no limitation on infringement with respect to
19    this limitation, is there?
20              MR. LoCASCIO:  I agree.  There would be none.  At
21    this point, it's using an MRI machine and processing it in some
22    way to generate this data.
23              THE COURT:  No, it's using an MRI machine and a
24    computer.
25              MR. LoCASCIO:  Correct, Your Honor, and the computer
```

1    of some sort does some sort of processing that is undefined,

2    and if that happens, ergo, you infringe.

3              THE COURT:  Well, now, what's the -- let me also

4    pursue one other avenue.  If it's pointless to you, still

5    answer it.

6              MR. LoCASCIO:  I would have anyway, but thank you for

7    reminding me.

8              THE COURT:  All right.  Where is the point of novelty

9    here?

10             MR. LoCASCIO:  Your Honor raises a question that we

11   identified as well.  And if I can go --

12             Sean, type 28.  Flip there.

13             THE COURT:  Where am I?

14             MR. LoCASCIO:  Slide 28, Your Honor.  Slide 28 looks

15   to what does this limitation matter?  Is this the point of

16   novelty or not?

17             THE COURT:  Just one second.

18             MR. LoCASCIO:  Sure.

19             THE COURT:  Oh, I see.  All right.

20             MR. LoCASCIO:  What Slide 28 talks about in the

21   context of *Cardiac Pacemakers* -- because in *Cardiac Pacemakers*,

22   the limitation at issue, which was not a verb "to do" something

23   or a verb "for doing" something, talked about how that step was

24   frankly not the point of novelty.

25             Here, NeuroGrafix is -- the processing piece of this

1   claim is, in fact -- was described as the point of novelty.

2   These are plaintiff's, NeuroGrafix's, opening and reply *Markman*

3   briefs.  The first quote -- this is the bottom of the page --

4   the inventors figured out how to create three-dimensional data

5   sets representative of neural tissue.  Okay.  Putting aside

6   that the only testimony to date is that they hadn't.  Where is

7   that in the patent?  It's nowhere.  It's not described, it's

8   not disclosed.  They don't tell you how to do it.

9          And so with respect to these claims, Your Honor, the

10  use of this term, "processing," in these claims to generate a

11  particular data set, that is the point of novelty.  And as

12  *Honeywell* and other cases say, where we're talking about the

13  alleged point of novelty, we can't just gloss over the

14  indefiniteness issues because that's the core of the matter.

15  If you don't look to see if they actually describe it and

16  describe in this case the way of performing, the "how" to

17  perform that function, well, then, the claim is, as you

18  identified, very broad -- charitably, what is called very

19  broad.

20         And the point of novelty in which they obtain a

21  patent was that improvement, which is never described or

22  discussed anywhere and now would be, in essence, read out of

23  the claim because the claim would be so broad as to encompass

24  any way to do it, regardless of the alleged novel improvement

25  over the prior art.  So, hopefully, that answers Your Honor's

1    question on that score.

2              THE COURT:  Well, let's let Mr. Fenster speak now.

3              MR. FENSTER:  Your Honor, first, let me just correct

4    what Mr. LoCascio said regarding the four primary Federal

5    Circuit cases.  First, with respect to *Masco*, he said that it

6    was different than this case because it was transmitting a

7    force but didn't say to do something.  The language of -- and

8    he didn't have the case in front of him.  I put the case on the

9    Elmo for the court.  Here is the language that *Masco* -- that

10   the *Masco* Federal Circuit court looked at, that it was

11   transmitting a force applied to the dial to drive the lever.

12   Just like this case is processing to generate a data set, just

13   like in *Seal-Flex*, it was adhering -- or spreading the adhesive

14   to adhere.  And in that case, *Masco* reversed the lower court --

15   lower court's finding that it was step-plus-function.

16             In *Seal-Flex*, while the majority opinion left alone

17   and just did not address the parties' agreement that

18   step-plus-function applied, it is Judge Rader's thoughtful

19   concurrence, that this court cited in its claim construction,

20   which did go through and say not withstanding the parties'

21   agreement, I think it incumbent upon the court to analyze the

22   112, six issue --

23             THE COURT:  So do I.

24             MR. FENSTER:  -- and doing so, Judge Rader found it

25   was improper to apply step-plus-function notwithstanding the

1  parties' agreement.

2        THE COURT:  I think he's right about what he says

3  here, that you must analyze it, and that is why I asked you all

4  the questions I asked you.

5        MR. FENSTER:  So, now, with respect to -- you asked

6  what is the point of novelty and would this cover any method?

7  And, Your Honor, I have to object to Mr. LoCascio's

8  characterization, and the court's, to this extent:  That it

9  would cover any method.  Claim 36 is a very specific method,

10  and the point of novelty, Your Honor -- and if you'll allow me

11  to just walk through the claim -- this is a specific claim.

12  This requires exposing to a predetermined arrangement of

13  diffusion-weighted gradients and vector processing in order to

14  generate a data set that shows the nerve, as distinguished from

15  surrounding structures that do not show diffusion anisotropy.

16        THE COURT:  Yes, I know.

17        MR. FENSTER:  That is the point of novelty of this

18  claim.  The point of novelty of claim 36 is this combination of

19  using a predetermined arrangement of diffusion-weighted

20  gradients and vector processing in order to generate the data

21  set in order to show the nerve in a way that was previously

22  unknown.

23        This is an important invention, Your Honor.  It is

24  used daily to materially help people.  A very dear friend's

25  daughter yesterday got a neurogram of her face to show how to

1  correct some surgery -- how to surgically correct some damage

2  that was done to her nerves during brain cancer surgery.  This

3  is important:  Up until 1992, it was unknown how to image

4  nerves outside of the brain and cerebral spinal fluid.

5       University of Washington has this patent now that

6  describes lots of different methods for doing it.  The method

7  of claim 36 is different than the other claims.  The method of

8  claim 36 is specific and it's limited to the specific

9  combination of diffusion-weighted gradients and vector

10  processing in order to show the image separate from -- to

11  generate this data set.  That's the point of novelty.

12       And when we get to enablement, we'll show enablement,

13  and when we get to anticipation, we'll see whether Siemens can

14  come up with any piece of prior art that shows a combination of

15  a predetermined arrangement of diffusion-weighted gradients and

16  vector processing.  I have yet to see that prior art.  But that

17  is the point of novelty of this claim.

18       So, Your Honor, in terms of your question of where do

19  we go next, if the court perceives that further construction of

20  processing as an ordinary term and not a step-plus-function

21  term is warranted, then I suggest that we go ahead and brief

22  that issue.  We'll exchange --

23       THE COURT:  What does "processing" mean?

24       MR. FENSTER:  Exactly.  We'll go ahead and exchange

25  proposed constructions.  It's not something we did before

32

1   because the only issue was whether it was step-plus-function,

2   and Siemens didn't urge an alternate claim construction in the

3   event it lost the step-plus-function proposal.

4          So what I would suggest is if the court wants --

5   thinks that further explanation or construction or processing

6   as an ordinary term is warranted, let's have an expedited, or

7   not, claim construction process where we exchange terms and

8   brief it for the court to decide.  I don't know that a separate

9   hearing is necessary, but the court -- that's obviously within

10  the court's discretion.

11         THE COURT:  All right.  Let's go on to the others.

12         MR. LoCASCIO:  Your Honor, if I may.  Before we get

13  there, I just want to raise one point.  That's -- I think all

14  of us now agree that the analysis of Judge Rader in *Seal-Flex*

15  is what needs to be done; I contend the court has done that.

16  And indeed --

17         THE COURT:  I have done that.  I don't care whether

18  you think it's done in writing or we have covered it.  That is

19  what prompted all this.

20         MR. LoCASCIO:  And my point is only that the claim

21  language here, *Seal-Flex* says you have to look at it.  And in

22  *Seal-Flex* -- ultimately, Judge Rader, when he does look at it,

23  says this is, despite the presumption, 112, six,

24  step-plus-function, but it does, in fact, disclose how to do

25  it.  And in that case, quite differently than here.  The two

```
 1    verbs -- if we can think of that -- are "spreading" for
 2    "adhering," and doesn't just say, Figure out how to adhere.  It
 3    says "spreading an adhesive tack coating," and the court
 4    found -- or Judge Rader found that that was a description of
 5    how to adhere the mat to the foundation.
 6              THE COURT:  Well, here's my problem:  He wasn't
 7    looking at a software patent.
 8              MR. LoCASCIO:  I agree.  He found structure -- he
 9    found a way to do it there because it described one.  And I
10    think there is some analogy with respect to software patents,
11    given the federal circuit's -- call it criticism of generic
12    "processing means" claims.  In the means context, the term
13    "processor" has been described and found to be insufficient to
14    satisfy.  A "processing means" or a "processor" is not enough
15    without an algorithm.  And those are the Aristocrat and other
16    cases that we've talked about in the original round on this.
17              And so I agree the uniqueness of a software
18    implementation, as here, if -- as we see in claim 36(e), here
19    "processing" to generate.  The function, Your Honor, no one --
20    nothing in this claim tells one how to do it.  And so just like
21    the analysis that Seal-Flex requires, the analysis here is,
22    Well, does that tell me enough about how do it?  In Seal-Flex
23    they did.  Here, they do not.  And no one from NeuroGrafix
24    identifies any specifics in the claim where it would need to be
25    or either in the -- or even in the specification about how one
```

1   actually does that processing.  And absent that, when you have

2   language here that has a function of generating a data set,

3   with the only thing perceived by even NeuroGrafix to be an act

4   of processing, whereby, every account, it's done through some

5   computerized means, that alone is insufficient to satisfy their

6   obligations under 112, six.

7           This is a case where the presumption is overcome and,

8   indeed, there is no description of how.  The act, as it would

9   be argued by NeuroGrafix, of processing is just taking steps,

10  taking steps to generate.  And if they said it that way, it

11  would be prima facie 112, six.  They didn't.  They used the

12  word "processing," but it had no description, Your Honor, of

13  the key question from all of the Federal Circuit precedents,

14  how to do it.

15          THE COURT:  Let's go on.

16          MR. FENSTER:  Your Honor, may I briefly address this

17  before we go on and lose the point?  May I respond?

18          THE COURT:  I will never lose the point that -- what

19  we're talking about.

20          MR. FENSTER:  We're about to move to a different

21  motion.  May I just respond on this?

22          THE COURT:  Yes.

23          MR. FENSTER:  Your Honor, Mr. LoCascio urges that

24  "processing" doesn't mean anything and it is, therefore, not an

25  act.  It is contrary to the Federal Circuit's decisions.  So in

---

*UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA*
*COURT REPORTER DEBORAH K. GACKLE*

1    *Cardiac Pacemakers*, the court looked at determining -- the

2    claim language in *Cardiac Pacemakers* was "determining a

3    condition of the heart from among a plurality of conditions of

4    the heart."

5         Now, two things about this:  One I would submit, Your

6    Honor, that "determining" is no more generic than "processing,"

7    That "determining," which was found to be an act sufficient to

8    reverse a step-plus-function finding in *Cardiac Pacemakers*, is

9    just like processing.  The steps of "determining" -- Mr.

10   LoCascio could make the exact same argument with respect to

11   "determining," and the Federal Circuit went the other way.

12        The other important point about *Cardiac Pacemakers* is

13   that this is software.  How do we think that the determining a

14   condition of the heart was done?  It was done with software

15   just like this.  And, Your Honor, there is no support in

16   Federal Circuit or other case law that I found to suggest that

17   the step-plus-function analysis, as to whether a recited verb

18   is a function or an act, is different in the software claim, or

19   in a claim that involves software, than in a claim that

20   doesn't.

21        There is nothing to suggest -- and I haven't gone

22   through and specifically analyzed all of the cases to see did

23   this involve software or didn't it, but there has never been a

24   distinction drawn by the court as to determining whether

25   something is an act or a function based on whether or not

1  software is involved.  And, Your Honor, just based on the few

2  cases that we have before us today, I would suggest that

3  *Cardiac Pacemakers* suggests that it doesn't and that that is

4  not a valid distinction to find a step-plus-function contrary

5  to the great weight of law.

6         Second, let me point out that *Caterpillar*, which is a

7  Northern District of Indiana case, which was cited by the

8  defendants for step-plus-function analysis, and it was affirmed

9  without opinion by the Federal Circuit.  The *Caterpillar* case

10 involved four recited acts or functions.  They were

11 "providing," "determining," "retrieving" and "using."

12        And this is at 961 F. Supp. at 1256, I believe, where

13 it says, "Claim one involves the actions of providing,

14 determining, retrieving and using."

15        Again, "determining," just like in *Cardiac

16 Pacemakers*, was found to be an act.  It was not a generic.  And

17 what Mr. LoCascio is now arguing, that it doesn't tell you how

18 you determine, is exactly the argument that was rejected in

19 *Masco*, where the Federal -- where the defendant argued that the

20 transmitting -- a force was a step-plus-function, but it

21 doesn't tell you how to transmit the force.  And what the

22 Federal Circuit said -- is it rejected that argument.  It said

23 that it doesn't have to tell you exactly how, it is enough

24 that -- transmitting a force does describe how the lever is

25 driven then into the cam.  And it was the lower court that

1   reasoned that the word "transmitting," without more, does not

2   explain how the force is transmitted.  That's exactly

3   Mr. LoCascio's argument here, that we don't say how the data

4   set is processed.

5           And what the Federal Circuit said is it reversed and

6   said transmitting a force does describe how the lever is driven

7   into the cam.  Just as in this case, how the data set is

8   generated is by processing.  And so we urge the court to find

9   that there is no step-plus-function.

10          THE COURT:  All right.  Let's go on.

11          MR. FENSTER:  Thank you, Your Honor.

12          MR. LoCASCIO:  My suggestion would be to go to the

13  conspicuity.

14          THE COURT:  Fine.  Let's do that.

15          MR. LoCASCIO:  So, Your Honor, the first -- the

16  second tab in the slide that we handed up called "conspicuity"

17  are the slides I'm going to walk through now on this question.

18  And as Your Honor knows, in claims one, claims three, seven,

19  11, 12 and 18 and their dependent claims there is a conspicuity

20  of a nerve that is at least 1.1 limitation.  And with respect

21  to that, what Siemens raised in its *Markman* briefing were two

22  questions:  How does one calculate the conspicuity, and then

23  how would a user choose -- one of skill in the art choose an

24  ROI, or a region of interest, to measure that conspicuity.

25          And with respect to that second question, the court's

```
1   if there is to be anything further.  Thank you.
2               MR. LoCASCIO:  Thank you, Your Honor.
3               MR. FENSTER:  Thank you, Your Honor.
4                   (Proceedings concluded at 1:50 p.m.)
5                           - - - - -
6                   C E R T I F I C A T E
7
8           I hereby certify that the foregoing is a true and
9   correct transcript from the stenographic record of
10  the proceedings in the foregoing matter.
11
12                                      October 15, 2011
13  /S/ Deborah Gackle           _____
14      Deborah K. Gackle                    Date
        Official Court Reporter
15      CSR No. 7106
16
17
18
19
20
21
22
23
24
25
```