UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

NEUROGRAFIX, a California
corporation; NEUROGRAPHY
INSTITUTE MEDICAL ASSOCIATES,
INC., a California corporation; IMAGE-
BASED SURGICENTER
CORPORATION, a California
corporation; WASHINGTON
RESEARCH FOUNDATION, a not-for-
profit Washington corporation,

Plaintiffs,

v.

THE REGENTS OF THE UNIVERSITY
OF CALIFORNIA,

Defendants.

Case No. 2:11-cv-07591-MRP-RZ

**CLAIM CONSTRUCTION ORDER**

## I.   INTRODUCTION

Plaintiffs Neurografix, Neurography Institute Medical Associates, Inc.

("NIMA"), Image-Based Surgicenter Corporation ("IBSC"), and Washington

Research Foundation ("WRF") (collectively, "Neurografix") accuse Defendant, the

Regents of the University of California ("UC"), of infringing U.S. Patent No.

5,560,360 (filed Mar. 8, 1993), entitled "Image Neurography and Diffusion

-1-

Anisotropy Imaging" ("the '360 patent"), based on UC's performance of and provision of equipment and methods for peripheral nerve MR Neurography and diffusion anisotropy based tractography. Docket No. 1, Ex. 1. Midway into the litigation, General Electric Company ("GE"), the manufacturer of seven products accused of infringing the '360 patent, brought an intervenor complaint for declaratory judgment of non-infringement and invalidity against Neurografix. Docket No. 61.

As a first step in the litigation between Neurografix and GE, this Court construes the essential terms of the '360 patent.

## II.    BACKGROUND

This case involves a medical imaging patent. '360 Patent at col. 1 ll. 20-23. The patent relates to neural imaging using magnetic resonance. *Id.* Magnetic resonance imaging ("MRI") machines expose the subject's tissues to magnetic and electromagnetic fields. *Id.* at col. 2 ll. 5-7. The atomic nuclei of the exposed tissues respond to these fields. *Id.* The imaging device captures these responses and processes them to generate an image of the specimen. *Id.* at col. 2 ll. 7-9.

Neurografix's patented invention involves a method of collecting a data-set of signal intensities with spatial coordinates describing the positions of nerves. *Id.* at col. 6 ll. 27-30. This technology obviates the need to use intra-neural contrast agents. *Id.* col. 6 ll. 47-49. In nerves, water diffuses faster parallel to fiber

-2-

orientation than perpendicular. Docket No. 75 [General Electric Company's and the Regents of the University of California's Claim Construction Brief ("GE's Cl. Constr. Br.")] at 3. This is "anisotropic diffusion." *Id.* The patented invention uses MRI fields adapted to discriminate based on water diffusion anisotropy to produce an electric signal, in turn used to generate nerve images. '360 Patent col. 6 II. 56-64. A vector processor is used in one aspect of the invention to generate data representative of anisotropic diffusion. *Id.* at col. 42 II. 59-64. A suppression sequence is used in another aspect to increase the apparent diffusion anisotropy of structures. *Id.* at col. 45 II. 55-63.

As stated, the basic technology here relates to neural imaging techniques.

### III.   APPLICABLE LAW

### A. PRINCIPLES OF CLAIM CONSTRUCTION

"Analysis of patent infringement starts with 'construction' of the claim, whereby the court establishes the scope and limits of the claim, interprets any technical or other terms whose meaning is at issue, and thereby defines the claim with greater precision than had the patentee." *Pall Corp. v. Hemasure Inc.*, 181 F.3d 1305, 1308 (Fed. Cir. 1999). "Although the construction of the claim is independent of the device charged with infringement, it is convenient for the court to concentrate on those aspects of the claim whose relation to the accused device is in dispute." *Id.*

"The words of a claim 'are generally given their ordinary and customary meaning.'" *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312 (Fed. Cir. 2005) (citation omitted). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1313. "The inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation." *Id.* "That starting point is based on the well-settled understanding that inventors are typically persons skilled in the field of the invention and that patents are addressed to and intended to be read by others of skill in the pertinent art." *Id.*

"In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips,* 415 F.3d at 1314. "In such circumstances, general purpose dictionaries may be helpful. In many cases that give rise to litigation, however, determining the ordinary and customary meaning of the claim requires examination of terms that have a particular meaning in a field of art." *Id.* "Because the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent, and because patentees

frequently use terms idiosyncratically, the court looks to 'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.'" *Id.* (citation omitted). "Those sources include 'the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.'" *Id.* (citation omitted).

The specification is "always highly relevant to the claim construction analysis." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 978 (Fed. Cir. 1995). As Judge Rich wrote shortly after the creation of the Federal Circuit, "the specification . . . is the primary basis for construing the claims." *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985). "[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316. "In other cases, the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor." *Id.* In such cases, the inventor's intention as expressed in the specification "is regarded as dispositive." *Id.*

"[A] court 'should also consider the patent's prosecution history, if it is in evidence." *Id.* at 1317 (citation omitted). "The prosecution history, which we have

-5-

designated as part of the 'intrinsic evidence,' consists of the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent." *Id.*

In addition to using intrinsic evidence, this Court is also authorized to use extrinsic evidence in claim construction. *Phillips*, 415 F.3d at 1317 ("[W]e have . . . authorized district courts to rely on extrinsic evidence . . . ."). Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Id.* While extrinsic evidence can shed light on claim meaning, it is "less significant than the intrinsic record in determining 'the legally operative meaning of claim language.'" *Id.* (citation omitted). Further, extrinsic evidence is "unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1319.

## B. STEP-PLUS-FUNCTION

"An element in a claim for a combination may be expressed as a . . . step for performing a specified function without the recital of . . . acts in support thereof, and such claim shall be construed to cover the corresponding . . . acts described in the specification and equivalents thereof." 35 U.S.C. § 112 ¶ 6. The Federal Circuit "has rarely examined step-plus-function claim elements; however, the language of § 112[,] ¶ 6 and . . . [the Federal Circuit's] means-plus-function case law give

guidance for determining whether a claim element is in step-plus-function form so as to invoke the statute's claim interpretation requirements." *Seal-Flex, Inc. v. Athletic Track & Court Constr.*, 172 F.3d 836, 848 (Fed. Cir. 1999) (Rader, J., concurring). "The statute's format and language suggest a strong correlation between means and step-plus-function claim elements in both their identification and interpretation." *Id.*

"[A] claim element deserves step-plus-function treatment when expressed as a . . . step for performing a specified function without the recital of . . . *acts* in support thereof." *Id.* (citation omitted). "[T]he absence of the phrase 'step for' from the language of a claim tends to show that the claim element is not in step-plus-function form." *Id.* at 849. "[W]here a method claim does not contain the term 'step for,' a limitation of that claim cannot be construed as a step-plus-function limitation without a showing that the limitation contains no act." *Masco Corp. v. U.S.*, 303 F.3d 1316, 1327 (Fed. Cir. 2002). "However, claim elements without express step-plus-function language may nevertheless fall within § 112, ¶ 6 if they merely claim the underlying function without recitation of acts for performing that function." *Seal-Flex*, 172 F.3d at 849.

"In general terms, the 'underlying function' of a method claim element corresponds to *what* that element ultimately accomplishes in relationship to what the other elements of the claim and the claim as a whole accomplish." *Id.* at 850.

-7-

"Acts," on the other hand, correspond to *how* the function is accomplished. *Id.* The Federal Circuit has interpreted the term "steps" to refer to the generic description of elements of a process, and the term "acts" to refer to the implementation of such steps. *O.I. Corp. v. Tekmar Co., Inc.*, 115 F.3d 1576, 1583 (Fed. Cir. 1997). The step-plus-function provision of § 112, ¶ 6 is implicated only when "steps plus function without acts are present." *Id.*

"Unfortunately, method claim elements often recite phrases susceptible to interpretation as either a function or as an act for performing a function. Both acts and functions are often stated using verbs ending in 'ing.'" *Seal-Flex*, 172 F.3d at 849. "The difficulty of distinguishing acts from functions in step-plus-function claim elements" makes identifying them "inherently more problematic." *Id.* at 848. The Federal Circuit has cautioned against construing "every process claim containing steps described by an "ing" verb, such as passing, heating, reacting, transferring, etc. into a step-plus-function limitation." *O.I. Corp.*, 115 F.3d at 1583. The underlying policy concern is the potential "limiting [of] process claims in a manner never intended by Congress." *Id.*

# IV.   CLAIM CONSTRUCTION

## A. Claim construction for Claim 51

Claim 51 recites:

"A method of utilizing magnetic resonance to determine data representative of diffusion anisotropy exhibited by a structure, said method including the steps of:
> (a) exposing a region to a suppression sequence of electromagnetic fields that suppresses the electromagnetic responsiveness of structures in the region that do not exhibit diffusion anisotropy, *so as to increase the apparent diffusion anisotropy of structures in the region that exhibit diffusion anisotropy*, said suppression sequence of electromagnetic fields not including diffusion-weighted magnetic gradients;
> (b) exposing the region to a *predetermined arrangement of diffusion weighted magnetic gradients, said pre-determined arrangement of diffusion-weighted magnetic gradients chosen to:*
>> i)      *emphasize a selected structure in the region exhibiting diffusion anisotropy in a particular direction; and*
>> ii)     *suppress other structures in the region exhibiting diffusion anisotropy in directions different from said particular direction*;
> (c) for each of said diffusion weighted gradients, sensing a resonant response of the region to the diffusion-weighted gradient and producing an output indicative of the resonant response; and
> (d) *processing said outputs to generate data representative of the diffusion anisotropy of the selected structure.*"

'360 Patent col. 45 ll. 18-45 (emphasis added).

GE and Neurografix dispute the meaning of the boldfaced parts of Claim 51 above. As the Federal Circuit stated in *Pall Corp.*, "It is convenient for the court to concentrate on those aspects of the claim whose relation to the accused device is in dispute." 181 F.3d at 1308.

a. "*processing* said outputs *to generate* data representative of the diffusion anisotropy of the selected structure." '360 Patent col. 45 I. 43-44 (Claim 51(d)) (emphasis added).

i. **Claim 51(d) is *not*[1] a step-plus-function claim because it lacks the words "step for" and recites the act of "processing."**

Claim 51(d) lacks the presumption-of-¶ 6-triggering "step for" language. This void "tends to show that the claim element is not in step-plus-function form." *Seal-Flex*, 172 F.3d at 849 (Rader, J., concurring). Absent these magic words, this Court cannot categorize 51(d) as a step-plus-function claim unless it "***contains no act***." *Masco*, 303 F.3d at 1327 (emphasis added).

But before searching for an act, the Court must first identify the claim's underlying function. The underlying function of a method claim element corresponds to "*what* the element ultimately accomplishes in relationship to what the other elements of the claim and the claim as a whole accomplish." *Seal-Flex*, 172 F.3d at 850. "Unfortunately, method claim elements often recite phrases susceptible to interpretation as either a function or as an act for performing a function. Both acts and functions are often stated using verbs ending in 'ing.'" *Id.* at 849. The difficulty of distinguishing acts from functions in step-plus-function claim elements makes identifying them inherently more problematic. *Id.* at 848.

---

[1] In a previous matter, this Court identified Claims 36, 39, 46, and 49 as step-plus-function claims. *Neurografix v. Siemens Med. Solutions USA, Inc.*, 10-cv-1990 MRP RZX, 2011 WL 3439324 (C.D. Cal. May 5, 2011). Although the Court told the plaintiffs not to reargue the *Siemens* claim construction, the Court has now reconsidered its construction *sua sponte. Id.*

-10-

Claim 51 is a four-step method claim. '360 Patent col. 45 II. 18-45. Its preamble recites a "method of utilizing magnetic resonance *to determine* data representative of diffusion anisotropy exhibited by a structure . . . ." '360 Patent col. 42 II. 43-45 (emphasis added). This preamble enlightens the Court about what the method claim as a whole seeks to accomplish. Claim 51 aims to determine data representative of a structure's diffusion anisotropy. To that broader end, the implementation methodology is magnetic resonance imaging.

Steps (a), (b), and (c) of Claim 51 perform respectively the tasks of (a) increasing apparent diffusion anisotropy of structures exhibiting diffusion anisotropy using a suppression sequence, (b) emphasizing the selected structure and suppressing other structures by exposing the region to a predetermined arrangement of diffusion-weighted magnetic gradients, and (c) producing an output indicative of the detected resonant response for each diffusion-weighted gradient. *Id.* at col. 45 II. 21-43.

Claim step (d) then *processes* the step (c) outputs *to generate* data representative of the diffusion anisotropy of the selected structure. *Id.* at col. 45 I. 43-44 (emphasis added).

Generating data describing the selected structure's diffusion anisotropy is the underlying function of 51(d). This finding is consistent with Claim 51's overall goal of determining data representative of a structure's diffusion anisotropy. And

-11-

in light of what steps (a) through (c) incrementally contribute to that overarching goal, it is clear that the underlying function of step (d) is ***to generate*** data representative of the selected structure's diffusion anisotropy. Processing is the implementation methodology standing between the step (c) outputs and the step (d) data. Generation of that data is the function as far as step (d) is concerned.

GE argues that the singular function of step (d) is the entire language: "processing . . . to  generate . . . ." GE's Cl. Constr. Br. at 16. GE thus seeks to collapse the separate claim terms of "processing" and "to generate" into a unitary function of "processing . . . to generate."[2] But Judge Rader in the *Seal-Flex* concurrence did not collapse "spreading" and "for adhering" into a unitary function of "spreading . . . for adhering." *Seal-Flex*, 172 F.3d at 836. Judge Rader identified "adhering" as the underlying function. *Id.* at 839.

GE provides no basis to treat "processing . . . to generate" as a unitary functional claim, but not do the same for "spreading . . . for adhering." To be sure, GE does argue that processing is too generic to be an act. GE's Cl. Constr. Br. at 17. But that contributes nothing to the Court's present exercise of identifying step

---

[2] Although GE collapses "processing " and "to generate" in a unitary phrase in its claim construction proposal, GE's Cl. Constr. Br. at 16, just two pages later it characterizes the function of step (d) as "to generate data representative . . . ." *Id.* at 18.

(d)'s underlying function by reference to the remaining claim steps' individual contributions toward the method claim's overarching goal.

The Court thus finds that the function of Claim 51(d) is generating data representative of the selected structure's diffusion anisotropy.

Next, the Court moves to the critical task of locating an act in the claim language. If the Court does find an act in step (d), then *Masco* ends the inquiry and ¶ 6 does not apply. 303 F.3d at 1327 ("[W]here a method claim does not contain the term 'step for,' a limitation of that claim cannot be construed as a step-plus-function limitation without a showing that the limitation contains no act."). But if the Court does not find an act, then step (d) recites a function ("generating data . . . .") without reciting an act, and ¶ 6 does apply.

"[A]cts correspond to *how* the function is accomplished," *Seal-Flex*, 172 F.3d at 850, i.e., the "implementation" of steps. *O.I. Corp.*, 115 F.3d at 1583. The recited act of "processing" the step (c) outputs plainly implements the data-generation function of step (d). The recited act is therefore "processing."

GE argues that "processing" is not an act for the "generation" function because "the mere word 'processing' provides no information regarding ***how to accomplish the claimed function*** without special programming." GE's Cl. Constr. Br. at 17 (emphasis added). The Court agreed with this argument in *Siemens*, 2011 WL 3439324, but now believes that it may have misinterpreted the context in

-13-

which Judge Rader stated, in the *Seal-Flex* concurrence, that "[a]cts . . . correspond to ***how the function is accomplished***." 174 F.3d at 850 (emphasis added). There is a subtle but critical difference between "how a function is accomplished" and "how an act accomplishes a function." The former is an identify-the-act question, appropriate for deciding if 35 U.S.C. § 112 ¶ 6 applies in the first instance. The latter is an analyze-the-act question, appropriate for determining if a claim element is valid under the enablement, written description, and definiteness inquiries under 35 U.S.C. § 112 ¶¶ 1-2.

Identifying an act to see if ¶ 6 applies (step-plus-function identification) is an inherently less searching inquiry than analyzing the same act under ¶¶ 1-2 (enablement, written description, definiteness). The *Seal-Flex* concurrence confirms this view. 172 F.3d at 836. Judge Rader did not probe the inner workings of the recited act of "spreading." *Id.* He connected the recited function of "adhering" to the recited act of "spreading" and terminated the step-plus-function inquiry. *Id.* Importantly, Judge Rader made no attempt to determine if the word "spreading" provided any information regarding how to accomplish the claimed function of adhering the mat to the foundation. This is precisely what this Court appears to have done in the *Siemens* claim construction, 2011 WL 3439324, and what GE asks this Court to do again now. GE's Cl. Constr. Br. at 17 ("[T]he mere word 'processing' provides no information regarding how to accomplish the

-14-

claimed function without special programming."). The central question is not how processing accomplishes the generating function, but how generating is accomplished. The answer to the former question is irrelevant to whether ¶ 6 applies. The existence of any answer to the latter, recited in the claim language, suffices to hold that ¶ 6 does not apply.

The Federal Circuit has not, to this Court's knowledge, analyzed an act *past the point of identification* to determine ¶ 6 applicability. Perhaps the Federal Circuit *should* go down this road in the first instance and carve out a workable distinction between "processing" intangible data on a general purpose computer and "spreading" a tangible adhesive tack over a foundation surface. But this court now declines to go where the Court of Appeals for the Federal Circuit has not gone before.

Finally, GE cites means-plus-function precedent from the Federal Circuit and lower courts for the proposition that generic terms like "processing" are not sufficiently specific so as to avoid 35 U.S.C. § 112 ¶ 6. GE's Cl. Constr. Br. at 17.

The Federal Circuit rejected precisely these "parallelism" arguments in *O.I. Corp.* 115 F.3d at 1576. In that case, the patentee, Tekmar, argued that because the method claims "parallel" the apparatus claims, they must be construed consistently with the apparatus claims. *Id.* at 1583. The Federal Circuit agreed that the steps in the method claim were *essentially in the same language* as the limitations in the

apparatus claims, albeit without the "means for" qualification. *Id.* But it rejected the parallelism argument and declared that "each claim must be independently reviewed . . . to determine if it is subject to the requirements of Section 112, ¶ 6." *Id.* "Interpretation of claims would be confusing indeed if claims that are not means or step-plus-function claims were to be interpreted as if they were, only because they use language similar to that used in other claims that are subject to this provision." *Id.* at 1583-84.

The Federal Circuit's rejection of parallelism arguments is sensible because step-plus-function claims raise unique problems. *See Seal-Flex*, 172 F.3d at 848 ("The difficulty of distinguishing acts from functions in step-plus-function claim elements makes identifying them inherently more problematic."). "Unfortunately, method claim elements often recite phrases susceptible to interpretation as either a function or as an act for performing a function. Both acts and functions are often stated using verbs ending in 'ing.'" *Id.* at 849. The Federal Circuit has cautioned against construing every process claim containing steps described by an "ing" verb, such as passing, heating, reacting, transferring, etc. into a step-plus-function limitation. *O.I. Corp.*, 115 F.3d at 1583. The Court heeds this cautionary note and declines to rule that "processing" is not an act.

Claim 51(d) recites an act – "processing." '360 Patent col. 45 ll. 44-45. Because the claim language does not recite the words "step for" and does recite the

-16-

act of "processing," *Masco* terminates this inquiry. 303 F.3d at 1327. Section 112 ¶ 6 does not apply. The Court now holds that Claim 51(d) is ***not*** a step-plus-function claim.

### ii. Claim construction of "processing"

The '360 specification and file history do not assign any special meaning to the claim term "processing." Step (c) produces certain outputs. '360 Patent col. 45 II. 39-42. Step (d) processes these step (c) outputs to generate data representing the selected structure's anisotropy diffusion. *Id.* at col. 45 II. 43-45. Data in, data out. The Court thus construes the claim term "processing" using a plain meaning approach. "Processing" in 51(d) therefore means "using a general purpose computer to operate on data."

This construction also applies to "processing" as used in Claim 36(e) and "processed" in Claim 52. While those claims contain other limitations, the *Seal-Flex* concurrence analysis applies in an identical manner. 172 F.3d at 836. Claim 36(e) and Claim 52 lack the words "step for." Both recite the processing act. Neither, therefore, is a step-plus-function claim under *Masco*, 303 F.3d at 1327.

b. "*[P]redetermined* arrangement of diffusion weighted gradients ***chosen to***: i) emphasize a selected structure in the region exhibiting diffusion anisotropy in a particular direction; and ii) suppress other structures in the region exhibiting diffusion anisotropy in directions different from said particular direction" '360 Patent col. 45 I. 30-38 (Claim 51(b)).

For the above language in Claim 51(b), GE proposes the following construction: "an arrangement of diffusion-weighted gradients selected and oriented ***by the user*** in advance of their application so as to emphasize the selected structure and suppress other structures." GE's Cl. Constr. Br. at 12 (emphasis added). This, the Court calls the "acting-entity" proposal. Here, GE asks the Court to say something about who is behind the wheel for the recited claim term "chosen to." The diffusion weighted gradients do not magically rearrange themselves. Some entity must act to choose the optimal initial gradient arrangement.

For support, GE relies on two independent grounds: (1) the intrinsic record; and (2) logic. The Court rejects both grounds and declines to import an extraneous limitation of "user" from a preferred embodiment in the specification into Claim 51(b).

First, GE draws a straight line between Claim 51(b) and Figure 10 in the specification. *Id.* at 12. Figure 10 illustrates a preferred embodiment featuring an MRI operator with advanced knowledge about the axis of the anisotropic object of interest. '360 Patent at Fig. 10, blocks 132-40; 15:40-62; 16:26-47. GE then lifts this MRI operator from the confines of one preferred embodiment in the

-18-

specification and drops the operator (now known as "the user") into the "foreign

land" of Claim 51(b). GE's Cl. Constr. Br. at 12. Claim 51(b) is foreign because

the MRI operator had never previously been in 51(b) until GE's claim construction

proposal. The actual language of Claim 51(b) makes no mention of or reference to

the entity doing the choosing, let alone qualifying the entity by calling it a "user."

'360 Patent col. 45 II. 29-38.

The Court does not need to inquire into the identity of the acting entity for

claim construction. The Federal Circuit "has repeatedly stated that while claims are

to be construed in light of the specification, they are not necessarily limited by the

specification." *Enercon GmbH v. Int'l Trade Comm'n*, 151 F.3d 1376, 1384 (Fed.

Cir. 1998). "Specifications teach. Claims claim." *SRI Int'l v. Matsushita Elec.

Corp. of Am.*, 775 F.2d 1107, 1121 n.14 (Fed. Cir. 1985). "The court must take

care in its analysis, when locating in the written description the context for a

disputed term, not to import a limitation from that written description. It must use

the written description for enlightenment and not to read a limitation from the

specification." *Playtex Prods., Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 906

(Fed. Cir. 2005); *see also Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*

340 F.3d 1298, 1306 (Fed. Cir. 2003) (holding that district court erroneously

imported limitations from the *preferred embodiments* into the claim); *Resonate Inc.

v. Alteon Websystems, Inc.*, 338 F.3d 1360, 1365-65 (Fed. Cir. 2003) ("[T]he

written description is not a substitute for, nor can it be used to rewrite, the chosen claim language."); *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988) ("*[P]articular embodiments* and examples appearing in the specification will not generally be read into the claims."); *Sjolund v. Musland*, 847 F.2d 1573, 1582 (Fed. Cir. 1988) ("[W]hile it is true that claims are to be interpreted *in light of* the specification and with a view to ascertaining the invention, it does not follow that limitations from the specification may be read into the claims . . . .").

This point bears repeating: Claim 51(b) does not recite any user, operator, or similar acting entity. Between the prohibition against reading in limitations from the specification into the claim on one end, and the dictate of construing claims in light of the specification on the other, GE's import of a "user" falls in the former category and is thus prohibited.

GE is saying something more, however. Intrinsic evidence aside, *someone* must be behind the wheel for the recited acts "predetermined" and "chosen to." Claim 51(b). GE wants this Court, during claim construction, to identify that someone as "a user" or "operator."[3] Put another way, GE wants this Court to insert

---

[3] To quote GE's counsel, "Your Honor, [opposing] counsel takes issue with the notion of having the word 'user' in the language; but *someone* has got to do the choosing . . . ." Transcript of Oral Argument at 59 (No. CV 11-7591-MRP-RZ).

a missing-but-necessary predicate, the operator or user, between the actual recited words of 51(b).

Just last year, the Federal Circuit rejected a district court's insertion of a missing-but-necessary-predicate-type extraneous limitation during claim construction. *Markem-Imaje Corp. v. Zipher Ltd.*, 657 F.3d 1293 (Fed. Cir. 2011). In *Markem-Imaje*, the Federal Circuit held that "[patent] claims need not recite every component necessary to enable operation of a working device.'" *Id.* at 1301 (quoting *Rambus, Inc. v. Infineon Tech. AG*, 318 F.3d 1081, 1093 (Fed. Cir. 2003)).

The patent dispute in *Markem-Imaje* involved tape drive systems used in industrial thermal transfer printers. *Id.* The patentee asserted U.S. Patent No. 7,150,572 ("the '572 Patent"), directed to "a heat transfer printing apparatus that provided increased control over the acceleration, deceleration, speed, and positional accuracy of the printing operation, while minimizing waste of unused portions of the ink ribbon." *Id* at 1294-95.

The construed claim language was: "said controller calculates a length of tape to be added to or subtracted from tape extending between said spools in order to maintain tension in said tape between predetermined limit values." *Id.* This claim language plainly does not recite any limitation regarding a method of deriving a tension measurement. But the district court found that "some method of

deriving a tension measurement, whether directly or indirectly, is a ***necessary predicate*** to maintaining tension 'between predetermined limit values.'" *Markem Corp. v. Zipher Ltd.*, 2008 WL 4116666 at *12 (D.N.H. 2008) (emphasis added). The district court then reasoned that "without having a reasonable estimate of the current tape tension, it is not possible to identify whether the tension is approaching or exceeding the limit values," and inserted this extraneous missing-but-necessary predicate into the claim language by construing the claim to require some method of measuring tension. *Id.*

On appeal, the Federal Circuit vacated and remanded the lower court's claim construction. *Markem-Imaje*, 657 F.3d at 1293. The Federal Circuit offered this analogy: "A claim to an engine providing motive power to a car should not be construed to incorporate a limitation for an exhaust pipe, though an engine may not function without one." *Id.* at 1301. "Claims need not recite every component necessary to enable operation of a working device. That a device will only operate if certain elements are included is not grounds to incorporate those elements into the construction of the claims" *Id.*

Applied here, the analogous "engine" is the predetermined arrangement chosen to selectively emphasize and suppress certain structures, as recited in 51(b). The "exhaust pipe" is the user, as proposed by GE. GE's Cl. Constr. Br. at 12. That the predetermined-arrangement claim will only "operate" as recited with some

-22-

entity doing the choosing, i.e., a "user" or "MRI operator," is not grounds to

incorporate "the user" or the "MRI operator" into the construction of Claim 51(b).

This is a straightforward application of *Markem-Imaje*. 657 F.3d at 1293.

"Predetermined" means previously determined. The remainder of the claim

language, including the term "chosen to," is assigned its plain and ordinary

meaning.

   c. "so as to increase the apparent diffusion anisotropy of structures in the
      region that exhibit diffusion anisotropy" '360 Patent col. 45 II. 21-28
      (Claim 51(a)).

Neurografix and GE jointly propose that this term means "increase the

apparent diffusion coefficient." Docket No. 87 [Joint Stipulation Regarding the

Parties' Agreed Constructions for Certain Claim Terms and Modifications to Their

Proposed Constructions as to Other Claim Terms ("Joint Stipulation")]. While not

obligated to do so, the Court adopts the parties' joint proposal because the intrinsic

evidence supports this construction of the claim term "increase the apparent

diffusion anisotropy."

"Generally, there is a heavy presumption in favor of the ordinary meaning of

patent claim language as understood by one of ordinary skill in the art but this

presumption is overcome . . . where the patentee has chosen to be his own

lexicographer . . . ." *Bell Atlantic Network Servs., Inc. v. Covad. Commc'ns Grp.,

Inc.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001). "A patentee may choose to be his own

lexicographer and use terms in a manner other than their ordinary meaning, and a court thus must examine the intrinsic evidence to determine whether a patentee has given a term an unconventional meaning." *Id.*

As used in 51(a), "apparent" is not an adjective describing the term "diffusion anisotropy." Instead, "apparent diffusion anisotropy" is a term of art in and of itself, as indicated by several instances of the term "apparent diffusion coefficient" throughout the '360 Patent. *See, e.g.,* '360 Patent at col. 22 ll. 47-55. That the patentee did not explicitly define the term "apparent diffusion anisotropy" anywhere in the patent is not fatal to this construction. The Federal Circuit has held that the written description "can provide guidance as to the meaning of the claims, thereby dictating the manner in which the claims are to be construed, ***even if the guidance is not provided in explicit definitional format.***" *Bell Atlantic*, 262 F.3d at 1268 (emphasis added). "A patent specification may define claim terms by implication such that the meaning may be found in or ascertained by a reading of the patent documents." *Id.*

Thus, the Court agrees with GE and Neurografix that increasing a structure's apparent diffusion anisotropy is equivalent to increasing its apparent diffusion coefficient as that term is understood by persons skilled in the art. The '360 patent specification states, "Finally, the value of the . . . ***apparent diffusion coefficient*** D . . . ***is computed*** for a particular ROI at block 128." '360 Patent at col. 15 ll. 26-28

(emphasis added). Thus, the specification describes the coefficient as a quantifiable and computable measure, i.e., a number. Increasing apparent diffusion anisotropy for a selected structure means increasing its apparent diffusion anisotropy coefficient, i.e., a number. The plain meaning of the word "apparent" does not apply.

## B. Claim Construction for Claim 54

Claim 54 recites:

"A magnetic resonance apparatus for determining data representative of the diffusion anisotropy exhibited by a structure, said apparatus including:

    (a) *excitation and output arrangement means for exposing a region to a suppression sequence of electromagnetic fields that suppresses the electromagnetic responsiveness of structures in the region that do not exhibit diffusion anisotropy, so as to increase the apparent diffusion anisotropy of structures in the region that exhibit diffusion anisotropy, said suppression sequence of electromagnetic fields not including diffusion-weighted magnetic gradients*;

    (b) polarizing field source means positioned near said excitation and output arrangement means for exposing the region to a predetermined arrangement of diffusion-weighted magnetic gradients chosen to:

        i.  emphasize a selected structure in the region exhibiting diffusion anisotropy in a particular direction; and

        ii.  suppress other structures in the region exhibiting diffusion anisotropy in directions different from said particular direction, said excitation and output arrangement means *further for sensing a resonant response of the region to the diffusion-weighted gradient and producing an output indicative of the resonant response, for each of said diffusion weighted gradients*; and

    (c) processor means coupled to said excitation and output arrangement means for processing said outputs to generate data representative of the diffusion anisotropy of the selected structure."

'360 Patent 45:52-67, 46:1:15 (emphasis added). The boldfaced claim language is in dispute.

> a. "excitation and output arrangement means for exposing a region to a suppression sequence of electromagnetic fields that suppresses the electromagnetic responsiveness of structures in the region that do not exhibit diffusion anisotropy, so as to increase the apparent diffusion anisotropy of structures in the region that exhibit diffusion anisotropy, said suppression sequence of electromagnetic fields not including diffusion-weighted magnetic gradients." '360 Patent col. 45 II. 55-63 (Claim 54(a)).

"An element in a claim for a combination may be expressed as a means . . . for performing a specified function without the recital of structure, material . . . in support thereof, and such claim shall be construed to cover the ***corresponding structure . . . described in the specification and equivalents thereof***." 35 U.S.C. § 112, ¶ 6 (emphasis added). Claim 54(a) is a means-plus-function claim.[4] "In construing a means-plus-function claim, the district court must first determine the claimed function and then identify the corresponding structure in the written description of the patent that performs that function." *Baran v. Med. Device Techs., Inc.*, 616 F.3d 1309, 1316 (Fed. Cir. 2010).

The Court "construe[s] the meaning of the words used to describe the claimed function[] using ordinary principles of claim construction." *Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 324 F.3d 1308, 1319 (Fed. Cir. 2003). The

---

[4] Neither party disputes that Claim 54(a) is a means-plus-function claim. For judicial economy, this Order skips the analysis of determining that Claim 54(a) is a means-plus-function claim.

plain and ordinary meaning of Claim 54(a)'s language shows that the function is "exposing a region to a suppression sequence . . . ." '360 Patent col. 45 II. 55-63.

Next, the Court identifies structures described in the specification corresponding to this function. A "structure disclosed in the specification is [a] 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *Braun Med., Inc. v. Abbot Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997).

In this case, the '360 specification clearly links computer 72 to the exposing-region-to-suppression-sequence function. '360 Patent col. 11 II. 9-11. But the computer itself cannot be a structure. For computer-implemented means-plus-function terms, the corresponding structure must be an algorithm disclosed in the specification. *See Aristocrat Tech. Australia v. Int'l Game Tech.*, 521 F.3d 1328 (Fed. Cir. 2008); *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1253 (Fed. Cir. 2005) (characterizing the rule of *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339 (Fed. Cir. 1999)).

The parties disagree about whether three algorithms (Dixon, STIR, and FLAIR) qualify as "structure[s] . . . *described* in the specification" under ¶ 6. Joint Stipulation at 2.

The Federal Circuit has held that with one exception, District Courts "cannot look to the prior art, identified by nothing more than its title and citation in a

patent, to provide corresponding structure for a means-plus-function limitation." *Pressure Prods. Med. Supplies, Inc. v. Greatbatch Ltd.*, 599 F.3d 1308, 1317 (Fed. Cir. 2010) . The exception is described in *Atmel Corp. v. Information Storage Devices*, 198 F.3d 1374 (Fed. Cir. 1999).

In *Atmel*, the Federal Circuit held that a reference's title *could by itself* convey the corresponding structure to skilled artisans. Atmel's expert, Callahan, testified that the Dickson article (the prior art reference in the specification) was so well known in the field (at the time of filing) that its title alone sufficed to convey the precise structure for the claimed means. *Atmel Corp. v. Info. Storage Devices*, 198 F.3d 1374, 1382 (Fed. Cir. 1999); Initial Brief for Appellant at 18-19, *id.*, (No. 99-1082).

The central inquiry is whether a skilled artisan would understand the reference title itself to disclose a structure. *See Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 953 (Fed. Cir. 2007) ("The inquiry is whether one of skill in the art would understand the specification itself to disclose a structure . . . .").

Just when a reference title sufficiently conveys structure is unclear. The mere words of a title alone could point to a precise structure for a claimed means ("literal approach"). Alternatively, a reference's sheer popularity among skilled artisans could lend the title its inherent structure-conveying attribute ("well-known-to-PHOSITA approach").

-28-

A comparison of the Federal Circuit's decisions regarding the respective reference titles in *Pressure Prods.* and *Atmel* convince this Court that the well-known-to-PHOSITA approach is correct and that the literal approach is at best insufficient or at worst incorrect, i.e., it is insufficient, perhaps incorrect, to simply look at the words of a reference's title to determine if it, on its own, conveys the precise structure to a skilled artisan. 599 F.3d at 1308; 198 F.3d at 1374.

In *Pressure Prods.*, the Federal Circuit identified corresponding structures for the claimed "means for permitting removal of said hemostatic valve and introducer sheath." 599 F.3d at 1317. The patent specification contained the reference title, "Tear Apart Cannula." U.S. Patent 5,125,904 (filed Jul. 9, 1991) col. 1 I. 52. The Federal Circuit held that "[t]he specification does not expressly describe use of a . . . tear . . . for removal." *Pressure Prods.*, 599 F.3d at 1318.

By comparison, the *Atmel* claim limitation was "high voltage generating means disposed on said semiconductor circuit for generating a high voltage from a lower voltage power supply." 198 F.3d at 1376. The specification stated, "[T]he present invention may include high-voltage generator circuit 34. Known Circuit [sic] techniques are used to implement high-voltage circuit 34. See On-Chip High Voltage Generation in NMOS Integrated Circuits Using an Improved Voltage Multiplier Technique, IEEE JOURNAL OF SOLID STATE CIRCUITS, Vol[.] SC-11, No. 3, June 1976. " *Id.* at 1383 ("the Dickson reference"). The Federal Circuit held

-29-

that the Dickson reference's title could sufficiently convey the structure to a skilled artisan. *Id.*

Thus, the *Pressure Prods.* title, "Tear Apart Cannula," did not convey the structure of "tearing" for the claimed removal means. 599 F.3d at 1318. But the *Atmel* title, "Improved Voltage Multiplier Technique" could adequately convey the precise structure of a voltage generating technique for the claimed "high voltage generating means." 198 F.3d at 1376. Under a literal approach, the *Pressure Prods.* title "Tear Apart Cannula" conveys the use of "tearing" as structure for the removal means as well as the *Atmel* title "Improved Voltage Multiplier Technique" conveys the use of a voltage multiplier technique structure for the high voltage generation means. That the Federal Circuit denied "structure" status to the *Pressure Prods.* title but granted it to the *Atmel* title means that the literal approach is incorrect at worst and insufficient at best. Thus, the *Atmel* exception cannot be a simple exercise in determining if mere words in the reference's title convey a structure to a skilled artisan.

Title-plus-citation references, without more, do not described structures under ¶ 6, *Pressure Prods.*, unless the disclosed structure is so well-known in the art that the reference's title alone conveys, in the specification, the precise structure for a recited claim, *Atmel.* 599 F.3d at 1308; 198 F.3d at 1374.

-30-

1    The Court now tests the Dixon, STIR, and FLAIR references against this

2    rule. The '360 specification states the following regarding the Dixon, STIR, and

3
4    FLAIR techniques:

5        "Other suitable alternatives include the Dixon technique for fat suppression
6        described in, for example, Dixon et al., *Simple Proton Spectroscopic
         Imaging*, 153 RADIOLOGY 189-194 (1984) and also STIR (short tau
7        inversion recovery) described in *Improved Fat Suppression in STIR MR
8        Imaging: Selecting Inversion Time through Spectral Display*, 178
         RADIOLOGY 885-887 (1991)." '360 Patent at col. 13 II. 32-40.
9

10       "Finally, carefully adjusted water suppression techniques can be used to
11       limit the contribution of the blood vessels and cerebro-spinal fluid (CSF) to
         the neural image generated by system 14. One such technique is fluid-
12       attenuated, inversion recovery (FLAIR), described in, for example, Bydde et
13       al., *Comparison of FLAIR pulse Sequences with Heavily T2 Weighted SE
         Sequences in MR Imaging of the Brain*, 185 RADIOLOGY SUPP. 151
14       (1992). '360 Patent at col. 24 II 54-61.

15
16   This shows that the specification cites only the title and citation for each

17   technique. These are textbook title-plus-citation references, the kind *Pressure*

18   *Prods.* prohibits this Court from considering as corresponding structures under ¶ 6.
19
20   599 F.3d at 1308. The next inquiry is whether the *Atmel* exception applies. 198

21   F.3d at 1374. The question is whether the Dixon, STIR, and FLAIR sequences
22
23   were so well-known in the relevant art (at the time of filing) that these titles

24   sufficiently convey the precise structures (suppression sequences) for the recited
25
26   means-plus-function.

27   The patent specification in *Atmel* characterized the Dickson article as a

28   "[k]nown circuit technique." U.S. Patent No. 4,511,811 (filed Feb. 8, 1982) col. 4

I. 58.  By comparison, the '360 specification says nothing about the popularity of the Dixon, STIR, and FLAIR techniques. A comparison of Dr. Filler's testimony in this case and the Atmel expert's testimony is helpful. Callahan, Atmel's expert, testified that the Dickson article (the specification reference) was so well known in the field (at the time of filing) that a skilled artisan would not have needed to refer to it directly, but would have known *simply from reading the title* the high voltage generator circuits to which the claim refers. Initial Brief for Appellant at 18-19, *Atmel*, 198 F.3d at 1374; (No. 99-1082).  This testimony was unrebutted. *Id.*

By contrast, Neurografix's expert, Dr. Filler, stated, "Those having ordinary skill in the art would understand that this is disclosing additional pulse sequences and further describing that these sequences suppress fat (i.e., tissue not exhibiting anisotropy) thereby enhancing nerve and other tissues that exhibit anisotropy." Docket No. 74 [Plaintiff's Claim Construction Brief ("Pl. Cl. Constr. Brief")], Ex. 11 at ¶ 64. Unlike Atmel's expert, Callahan, Dr. Filler said nothing about the popularity of the Dixon, STIR, and Flair techniques at the time of filing. Put another way, this Court has no grounds to equate the Dixon, STIR, and Flair references with *Atmel*'s Dickinson reference, which was so well-known that the mere title sufficed to convey the precise structure to a skilled artisan. 198 F.3d at 1374.

Important questions regarding the *Atmel* exception's applicability remain unanswered:

1. On March 8, 1993 (filing date), was the Dixon technique so well-known that the title-plus-citation, i.e., "Dixon et al., *Simple Proton Spectroscopic Imaging*, 153 RADIOLOGY 189-194 (1984)," sufficed to convey the precise structure, i.e., the Dixon suppression technique, to a skilled artisan?

2. On March 8, 1993 (filing date), was the STIR technique so well-known that the title-plus-citation, i.e., "*Improved Fat Suppression in STIR MR Imaging: Selecting Inversion Time through Spectral Display*, 178 RADIOLOGY 885-887 (1991)," sufficed to convey the precise structure, i.e., the STIR suppression technique, to a skilled artisan?

3. On March 8, 1993 (filing date), was the FLAIR technique so well-known that the title-plus-citation, i.e., "Bydde et al., *Comparison of FLAIR pulse Sequences with Heavily T2 Weighted SE Sequences in MR Imaging of the Brain*, 185 RADIOLOGY SUPP. 151 (1992)," sufficed to convey the precise structure, i.e., the Flair suppression technique, to a skilled artisan?

The Court has no basis to answer these questions in the affirmative and therefore holds that the Dixon, STIR, and FLAIR references are not corresponding structures under 35 U.S.C. § 112, ¶ 6.

(b) "polarizing field source means positioned near said excitation and output arrangement means for exposing the region to a predetermined arrangement of diffusion-weighted magnetic gradients chosen to: i) emphasize a selected structure in the region exhibiting diffusion anisotropy in a particular direction; and ii) suppress other structures in the region exhibiting diffusion anisotropy in directions different from said particular direction." '360 Patent 45:64-67, 46:1-11 (Claim limitation 54(b)).

The function of this means-plus-function claim, by its plain and ordinary meaning, is "exposing the region to a predetermined arrangement of diffusion-weighted magnetic gradients chosen to . . . ." '360 Patent col. 45 II. 65-67.

The parties agree that corresponding structures described in the '360 specification include gradient pulse generator 78, gradient field amplifier 82, and diffusional gradient coil pairs 68 and 70; and equivalents thereof. GE's Cl. Constr. Br. at 15. The dispute is whether the structures also include gradient field amplifier 80 and gradient coil pairs 64 and 66. *Id.*

GE starts with the premise that *a user* selects initial gradient arrangements. *Id.* at 15-16. GE then argues that coils 64 and 66 are ineligible as corresponding structures because a user cannot exercise any choice or selection regarding coils 64 and 66, given that they are fixed within the bore of the imager. *Id.* at 16 (pointing to lack of embodiment showing coils 65 and 66 being "used . . . by the user . . . ."). The Court rejects this import of a user into the claim language, and thus holds that the gradient field amplifier 80 and gradient coil pairs 64 and 66 are included as corresponding structures for means-plus-function Claim 54(b).

(c) "excitation and output arrangement means for . . . sensing a resonant response of the region to the diffusion-weighted gradient and producing an output indicative of the resonant response, for each of said diffusion-weighted gradients." '360 Patent 44:64-67 45:1-11 (Claim 54(b)).

The functions of this means-plus-function claim, by its plain and ordinary meaning, are "*sensing a resonant response* . . . and *producing an output indicative of the resonant response* . . . ." *Id.*

The Federal Circuit stated that § 112, ¶ 6 does not "permit incorporation of structure from the written description *beyond that necessary* to perform the claimed function." *Micro Chem., Inc. v. Great Plains Chem. Co., Inc.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999). "A court may not import into the claim features that are unnecessary to perform the claimed function. Features that do not perform the recited function do not constitute corresponding structure and thus do not serve as claim limitations." *Northrop Grumman Corp. v. Intel Corp.*, 325 F.3d 1346, 1352 (Fed .Cir. 2003).

GE argues that the corresponding structures include RF excitation coil 62, duplexer 88, preamplifier 90, mixer 92, low pass filter 96, and analog-to-digital converter 98. GE's Cl. Constr. Br. at 11. Neurografix argues that the corresponding structures include the external return coil, return coil, and return field coils described in the Background of the '360 patent. Plaintiff's Cl. Constr. Br. at 21-23. There are thus two disputes: (1) whether the duplexer 88, preamplifier 90, mixer 92, low pass filter 96, and analog-to-digital converter 98 ("duplexer et al.") are

corresponding structures; and (2) whether the external return coil, return coil, or return field coils described in the Background section of the '360 patent are corresponding structures.

First, the Court analyzes if the duplexer et al. are corresponding structures. GE argues that these components are critical structures for performing the second claimed function of "producing an output indicative of a response." GE's Cl. Constr. Br. at 11. Neurografix downplays the role of the duplexer-type components, characterizing their task as "to further process the output before it is converted to digital form . . . ." Plaintiff's Cl. Constr. Br. at 23.

The resolution of this issue turns on whether the function is defined as "producing an output," i.e. producing some (any) output, or "producing an output indicative of the resonant response," which in turn requires the produced output to *indicate* something about the resonant response. Adhering to the canon of construing claims by their plain and ordinary meaning, the Court finds that the function of Claim 54(b) is not producing just any output whatsoever – but an output *indicative* of the *sensed resonance response*. The "necessary or not" role of the duplexer-type components must now be assessed in light of this definition of the function – producing an output *indicative* of a sensed resonance response.

The duplexer 88, preamplifier 90, mixer 92, low pass filter 96, and analog-to-digital converter 98, process the coil 62 output and convert it into a form

-36-

*indicative* of the resonant response, i.e., an output form that indicates the sensed resonant response. '360 Patent col. 11 II. 37-39. Put another way, the duplexer et al. are not merely engaged in "further processing," but they in fact perform the *very* processing that transforms the coil 62 output into a different output, one *indicative* of the sensed resonance response. Thus, they are corresponding structures for 54(b).[5]

The second dispute is whether the external return coil, return coil, and return field coils described in the Background section of the '360 patent are corresponding structures. Neurografix contends they are. Plaintiff's Cl. Constr. Br. at 21-23. GE disagrees. GE's Cl. Constr. Br. at 11. "[S]tructure disclosed in the specification is 'corresponding' structure *only* if the specification or prosecution history clearly links or associates that structure to the function recited in the claim. This duty to link or associate structure in the specification is the *quid pro quo* for the convenience of employing § 112 ¶ 6." *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997).

"Clearly link" is not, and cannot be, synonymous with merely "being *in* the specification." As Judge Clevenger explained in *Elekta*:

> "Section 112, paragraph 6 was intended to allow the use of means expressions in patent claims without requiring the patentee to recite in the

---

[5] The patent specification does not support a finding that the coil 62 output is in and of itself indicative of the sensed resonant response. The point of using the components referred to as "duplexer et al." is to render an output indicative of the sensed resonance response.

claims all possible structures that could be used as means in the claimed apparatus. However, the price that must be paid for use of that convenience is limitation of the claim to the means specified in the written description and equivalents thereof. *If* the specification is *not clear* as to the structure that the patentee intends to correspond to the claimed function, *then* the *patentee has not paid that price* but is rather attempting to claim in functional terms unbounded by reference to structure in the specification. Such is impermissible in the statute." *Med. Instr. & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1211 (Fed. Cir. 2003) (emphasis added).

The cited "references" to the external return coil, return coil, return field coils in the Background section of the '360 patent primarily function to introduce the workings of a generic MRI machine. '360 Patent col. 2 II. 25-34. The external return coil, *id.* at 2:32-34; the return coil, *id.* at 2:34-40; and the return field coils, *id.* at 3:25-29, are all discussed in a vacuum – completely removed from the subsequent discussion about the patented neural imaging invention. The patentee does not "clearly link" these components to the described invention, let alone the specific means-plus-function Claim 54(b) under consideration. Again, mere presence in a specification is not synonymous with a clear link between a described structured and the claimed means. To be clear, the Court *does not* hold that corresponding structures can never be located in the Background section of a patent. The Court only finds that no clear link exists between Claim 54(b) and the external return coil, the return coil, and the return field coils as described in the Background section of the '360 Patent. By failing to provide a clear link, the '360

Patentee has not paid the price for use of the convenience of § 112, ¶ 6. The Court thus cannot grant the accompanying benefits.

Thus, the external return coil, return coil, return field coils are not corresponding structures for Claim 54(b).

## V.   CONCLUSION

The Court adopts the constructions set forth in this opinion for the disputed terms of the '360 Patent. These constructions shall govern all proceedings in this case:

**U.S. Patent No. 5,560,360 (filed Mar. 8, 1993).**

| Claim | Claim Term | Court's Construction |
|---|---|---|
| 51(a) | "so as to increase the apparent diffusion anisotropy of structures in the region that exhibit diffusion anisotropy" '360 Patent col. 45 II. 21-28. | "[T]o increase the apparent diffusion anisotropy" means to increase the "apparent diffusion coefficient," as that term appears in the '360 specification. *See, e.g.*, '360 Patent col. 22 I. 48.<br><br>The word "apparent" is not an adjective and does not assume its ordinary meaning.<br><br>The remainder of this claim is assigned its plain and ordinary meaning. |
| 51(b) | "*[P]redetermined* arrangement of diffusion weighted gradients *chosen to*: i) emphasize a selected structure in the region | "Predetermined" means previously determined.<br><br>The remainder of this claim is assigned its plain and ordinary |

| | | |
|---|---|---|
| | exhibiting diffusion anisotropy in a particular direction; and ii) suppress other structures in the region exhibiting diffusion anisotropy in directions different from said particular direction" '360 Patent col. 45 ll. 30-38. | meaning.<br><br>The Court refuses to import a "user" from the specification into the claim for performing the claim terms "predetermined" and "chosen to." |
| 51(d) | "*processing* said outputs *to generate* data representative of the diffusion anisotropy of the selected structure." '360 Patent col. 45 ll 43-44. | Section 112, ¶ 6 does not apply.<br><br>"Processing" means "using a general purpose computer to operate on data."<br><br>The remainder of the term is assigned its plain and ordinary meaning. |
| 36(e), 39, 46, 49, 52 | "*processing* said data representative of anisotropic diffusion to generate a data set describing the shape and position of said structure . . . ." '360 Patent 42:64-67, 43: 1-2 (Claim 36(e)).<br><br>"*Analyzing* the data," "*Combining* said data set" '360 Patent 43:22-42, 44:17-35, 44: 59-67 (Claims 39, 46, 49).<br><br>"said data representative of the diffusion anisotropy of the selected structure is *processed* to produce a data set that describes the shape and position of the selected | Section 112, ¶ 6 does not apply to any of these claims. While these claims do recite a step plus a function, they each recite an act (identified by boldface). Because the step-plus-function identification analysis in each of these claims is identical to the one conducted for Claim 51(d), the Court does not repeat the analysis for each claim in the interest of judicial economy.<br><br>"Processing" in Claim 36(e) and "processed" in Claim 52 mean "using a general purpose computer to operate on data."<br><br>The remainder of the term (for each claim) is assigned its plain |

| | | |
|---|---|---|
| | structure." '360 Patent col. 45 II. 46-49 (Claim 52). | and ordinary meaning. |
| 54(a) | "excitation and output arrangement means for exposing a region to a suppression sequence of electromagnetic fields that suppresses the electromagnetic responsiveness of structures in the region that do not exhibit diffusion anisotropy, so as to increase the apparent diffusion anisotropy of structures in the region that exhibit diffusion anisotropy, said suppression sequence of electromagnetic fields not including diffusion-weighted magnetic gradients." '360 Patent col. 45 l. 55-63. | The function is "exposing a region to a suppression sequence . . . ."<br><br>The corresponding structures are excitation coil 62, gradient coil pairs 64 and 66, computer 72 and front-end circuit 74, wherein the computer 72 and front-end circuit 74 are programmed with the CHESS pulse sequence, '360 Patent col. 13 II. 7-24; and equivalents thereof.<br><br>The Court does not find that Dixon, STIR, and FLAIR sequences were so well-known in the art on March 8, 1993 ('360 filing date) that a skilled artisan would recognize the precise suppression sequence structures from their mere title-plus-citation references in the specification. Thus, the Dixon, STIR, and FLAIR sequences are not described structures corresponding to the means-plus-function claim 54(a). |
| 54(b) | "polarizing field source means positioned near said excitation and output arrangement means for exposing the region to a predetermined arrangement of diffusion-weighted magnetic gradients chosen | The function is "exposing the region . . . ."<br><br>The corresponding structures are the gradient pulse generator 78, gradient field amplifiers 80, 82, and coil pairs 64, 66, 68, 70; and equivalents thereof. |

| | | |
|---|---|---|
| | | to: i) emphasize a selected structure in the region exhibiting diffusion anisotropy in a particular direction; and ii) suppress other structures in the region exhibiting diffusion anisotropy in directions different from said particular direction." '360 Patent col. 45:64-67, 46:1-15. | |
| | 54(b) | "excitation and output arrangement means . . . for sensing a resonant response of the region to the diffusion-weighted gradient and producing an output indicative of the resonant response, for each of said diffusion-weighted gradients." '360 Patent col. 46 ll. 6-11. | The function is "sensing a resonant response . . . and producing an output indicative of the resonant response . . . ." The corresponding structures are excitation coil 62, gradient coil pairs 64 and 66, computer 72 and front-end circuit 74, wherein the computer 72 and front-end circuit 74 are programmed with the CHESS pulse sequence, duplexer 88, preamplifier 90, mixer 92, low pass filter 96, and analog-to-digital converter 98; and equivalents thereof. The external return coil, return coil, and return field coils described in the Background section of the '360 patent are not clearly linked to the means-plus-function claim 54(b), and are thus not corresponding structures. |

1    IT IS SO ORDERED.

2

3

4    DATED: June 13, 2012

5                                                    Hon. Mariana R. Pfaelzer
                                                     United States District Judge
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28